STATE of Minnesota, Respondent,

v.

Moises Vidal ROBLEDO–
KINNEY, Appellant.

No. C2–99–806.

Supreme Court of Minnesota.

July 13, 2000.

John M. Stuart, Minn. State Public Defender, Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Mike Hatch, Atty. Gen., Susan Gaertner, Ramsey County Atty., Mark Nathan Lystig, Asst. Ramsey County Atty., St. Paul, for respondent.

## OPINION

PAGE, Justice.

Following a jury trial in Ramsey County District Court, appellant, Moises Vidal Robledo–Kinney, was convicted of one count of murder in the first degree in violation of Minn.Stat. § 609.185(3) (1998), two counts of murder in the second degree in violation of Minn.Stat. § 609.19, subds. 1(1) and 2(1) (1998), and one count of kidnapping in violation of Minn.Stat. § 609.25, subds. 1(3) and 2(2) (1998), for the kidnapping and murder of Joshua James Christenson. The court sentenced Kinney to life in prison without the possibility of release. On appeal, Kinney alleges that (1) the district court erred in allowing the state to use his June 1, 1998 statement to the police in connection with failed plea negotiations; (2) he was entitled to specific performance of the plea agreement reached as a result of those negotiations; (3) the indictment and trial were tainted by the improper use of his June 1, 1998 statement to the police; (4) the trial court erred in not instructing the jury on third-degree assault and in not naming his accomplices in the jury instructions; and (5) the prosecutor engaged in misconduct during closing argument. We affirm.

The relevant facts from the record can be summarized as follows. In January 1998, Christenson was enrolled in an inpatient chemical dependency treatment program at Regions Hospital. On January 30, 1998, Christenson left the hospital on a weekend pass. He met a friend, Alex Tovar, and the two went to a bar where they ran into Lionel Becerra and Kinney. Kinney invited Christenson and Tovar to a birthday party for Daniel Thompson being held in St. Paul at the home where Michael Cleveland lived with his mother. Christenson, Tovar, Kinney and Becerra attended the party along with Thompson, Cleveland, Robert Medina, Luis Lebron, Octavia Jones and others.

At some point during the party, Kinney and Christenson got into a disagreement that developed into a fight in Cleveland's backyard. During the fight, Kinney, along with others, wrapped masking tape around Christenson's head, covering his eyes, nose, and mouth. Christenson was then carried into the house and leaned against a dining room wall where he slid to the floor, as if unconscious. The tape was removed from Christenson's mouth, allowing him to breathe and he eventually started crying, at which point Kinney along with others resumed the beating by hitting, kicking, stomping, and jumping on him. At some point, Christenson tumbled down the basement stairs, where the beating continued and where Kinney sodomized him with a mop handle.

Eventually, Christenson was carried outside and put in the back seat of his car where he was stabbed by Tovar a number of times with a barbecue fork. Evidently not satisfied with the damage being done by the barbecue fork, Tovar went to the house, retrieved a large kitchen knife, and stabbed Christenson. Kinney then took

the knife, stabbed Christenson and said to Tovar, "I want to let you know that I'm with you, with you, with you on this." With his body still in the back seat, Christenson's car was abandoned on the corner of Kent and Jessamine Streets in St. Paul, where it was found the next day.

Kinney was arrested for Christenson's murder in May 1998 and almost immediately attempted to negotiate a plea agreement with the state. Those negotiations began on May 28 and culminated on June 1 with a plea agreement contingent on Kinney not having stabbed or sexually assaulted Christenson. Kinney's attorney assured the state's attorney that Kinney had not stabbed Christenson. Shortly after the agreement was reached, Kinney informed his attorney that he had both sexually assaulted and stabbed Christenson. That same day, without informing the state about what he had learned, Kinney's attorney allowed Kinney to give the police a statement.[1] As part of that statement, Kinney told the police he had sexually assaulted and stabbed Christenson. Based on that information, the state withdrew its offer of the plea agreement.

Kinney, claiming detrimental reliance, moved the district court for enforcement of the plea agreement. After an extensive hearing, the district court, by order dated November 12, 1998, denied the motion based on the mutual mistake of the state's attorney and Kinney's counsel, at the time the agreement was being negotiated, regarding the extent of Kinney's involvement in Christenson's death. The district court also concluded that Kinney had not detrimentally relied on the plea agreement. In Conclusion 3 of the November 12, 1998 Order's Conclusions of Law, the district court, referring to Kinney's June 1, 1998 statement, indicated: "At best, the infor-

mation obtained during the interview may be used to impeach Defendant should he testify at trial inconsistently with his June 1, 1998 statement. Defendant does not have the right to offer perjured testimony. Thus, there is no detriment in him being prohibited from doing so."

The parties and the court revisited Kinney's June 1, 1998 statement during jury selection on February 10, 1999. The discussion arose in the context of defense efforts to get the state to enter into a stipulation informing the jury that Kinney had given a statement to the police, but that the statement's contents were inadmissible. Part of the discussion took place off the record. On the record, Kinney's counsel summarized the off-the-record discussion as follows:

> MR. MALONE: Yes, Your Honor. It may be it is not necessary to make the record on this now, but at some point—and it's brief—I would like to make it, and that is this: I have asked the State to stipulate, as the Court knows, to the fact that the defendant made a statement following his arrest. The way I propose that was that—but that the stipulation would go on to say it is not admissible evidence, and they've refused that stipulation.
>
> And then off the record the Court and counsel discussed that, and the Court indicated that it would seem there are only three witnesses, potentially, who could testify to that fact, that Mr. Kinney made a statement-the two interrogators from St. Paul Police Department, Findley and Bohlig, who are precluded under *Kastigar*[2] from offering that evidence, and Mr. Kinney, should he choose to testify.
>
> And the Court then also indicated that, which I think we've all assumed,

---

1. Kinney's attorney was not present when Kinney gave the statement.

2. *See Kastigar v. United States,* 406 U.S. 441, 453, 460, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (holding that the parties cannot offer immunized testimony or evidence derived

from the immunized testimony and that the prosecution has the burden of proving that all evidence offered is derived from a legitimate source wholly independent of the immunized testimony).

but I would like to make a record that, should Mr. Kinney choose to testify, the Court indicated that, if that testimony was in any way different from his statement, that he would be impeached with his statement, would open the door. And I just think we ought to memorialize that. That is the state of—it has not happened yet, but that is what we have all assumed, and I think we should memorialize that.

In response, the district court stated:

THE COURT: I think the summary of our off-the-record discussion is accurate. The State had refused the stipulation.

The issue as to Sergeants Bohlig and Findley, they are precluded from testifying about the statement under the *Kastigar* issue being raised. So it would leave open the possibility of Mr. Kinney being the only other competent witness to testify about having done so, it would appear at this point at least.

The discussion that we had then off the record was such that if Mr. Kinney were to testify to that fact [his statement], I indicated that I thought that opened the door to the statement coming in. It—and I'm trying to be careful about this, *because what was occurring in my mind was a little different than what you just stated, Mr. Malone*—is that on that particular issue, I think that if Mr. Kinney raises the issue that "I gave a statement," that there's an inference to be drawn from that, even under the proposed stipulation, for the jury. One inference may be helpful to Mr. Kinney, certainly under the * * * defense's proposed stipulation, it could be argued that it's helpful to Mr. Kinney because it looks like he's cooperating, and that we're hiding the ball from the jury and not letting them know what he said.

I think that that, in effect, would be to mislead the jury. And the point of *Kastigar* * * * is to treat this as if the statement does not exist at all. And so

that I think *it's inappropriate to use it in any fashion.*

But if the defense seeks to use the statement, that that, in essence, is a waiver of the *Kastigar* issue, and that the substance of the statement then becomes admissible because the defense puts the statement at issue. It's sort of that sword-and-shield kind of argument, I guess, is—if you are going to use it one way, you are going to have to live with the consequences of that.

*I think that's a little different than a broader finding as to whether it's useful for impeachment purposes or otherwise.* And I just want to make it clear that this was my mental process at the time that we had the off-the-record discussion. And the reason that I had indicated that—I think that if you open the door, then the whole statement is fair game. It—in essence, I think it falls under the rule of completeness. You wouldn't be able to use a portion of the statement without the State, in effect, being able to put in the total statement so that the context would be understood.

(Emphasis added.)

At trial, the defense theory was that although Kinney took part in beating Christenson, he was not involved in the acts that resulted in Christenson's death. Kinney waived his right to testify at trial based on his claimed understanding that if he took the stand to testify, the court would allow his June 1, 1998 statement to be admitted into evidence.

### I.

Kinney raises three issues relating to the statement he gave to the police and the plea agreement he reached with the state on June 1, 1998. The first issue is whether Kinney was denied the right to testify in his own defense when the district court indicated in Conclusion 3 of the November 12, 1998 Order that the statement "[a]t best * * * may be used to impeach [Kinney] should he testify at trial inconsistently" with the statement. A district

court's evidentiary rulings are subject to an abuse of discretion standard. *See State v. Gassler,* 505 N.W.2d 62, 70 (Minn.1993). Rule 410 of the Minnesota Rules of Evidence provides that evidence of a guilty plea, or an offer to plead guilty to the crime charged, or any statements made in connection with such a plea or offer, is inadmissible in any proceeding, whether offered for or against the person who made the plea or offer. *See* Minn.R.Evid. 410; *see also* Minn.R.Crim.P. 15.06. Such evidence is "a nullity *ab initio* and to allow evidence of it is inconsistent with its legal obliteration." *State v. Jackson,* 325 N.W.2d 819, 822 (Minn.1982). There is no impeachment exception to the general rule that statements made in connection with plea negotiations are inadmissible. *See id.* at 823.

Kinney argues that the district court's statement, in Conclusion 3 from the November 12, 1998 Order, prevented him from testifying in his own defense. We disagree. It is true that statements made in connection with an offer to plead guilty are not admissible for any purpose whether offered by the state or the defendant. *See* Minn.R.Evid. 410; *Jackson,* 325 N.W.2d at 821–22. It is also true that Kinney's June 1, 1998 statement to the police was a statement made in connection with an offer to plead guilty. Therefore, Kinney is correct that it would have been error for the district court to allow the state to impeach him with his June 1, 1998 statement. But that is not what happened in this case.

The only issue before the district court at the hearing that resulted in the November 12, 1998 Order was Kinney's motion seeking to have the June 1, 1998 plea agreement enforced. In support of that motion, Kinney argued, among other things, that he gave the statement in reliance on the plea agreement. He further argued that this reliance was to his detriment. In response, the state argued that there was no detrimental reliance on Kinney's part. At no time did the state seek permission to use the statement at trial. In fact, the prosecutor made it clear that the state could not use and would not use Kinney's June 1, 1998 statement.[3] While the prosecutor went on to state that it would attempt to use Kinney's June 1, 1998 statement for impeachment purposes if Kinney got on the witness stand and offered testimony inconsistent with the statement,[4] it is clear from the record that the prosecutor did so in the context of explaining why Kinney had not detrimentally relied on the plea agreement.

■ In reading Conclusion 3 from the November 12, 1998 Order, it appears from the language used that the district court simply adopted language similar to that used by the prosecutor in explaining why there was no detrimental reliance. Even if we read Conclusion 3 as being more than an explanation of why there was no detrimental reliance, we cannot interpret it as anything more than an indication of what the district court *might do* if in fact Kinney took the stand and testified inconsistent with the June 1, 1998 statement. Because the court qualified Conclusion 3 by using the words "at best" and "may," there is no basis to read that conclusion as a

3. As part of the state's argument that there was no detrimental reliance, the prosecutor stated, "Now, the question becomes, was there detrimental reliance? Where is the detriment? The State has agreed that it cannot use, and will not use, Kinney's statement. It's inadmissible pursuant to the Rules of Evidence and the Rules of Criminal Procedure at his trial and the trials of all the other codefendants. There is no rule that would allow us to do that, as it was a result of a plea negotiation."

4. After stating that there was no rule that would allow the state to use Kinney's statement resulting from the plea negotiations, the prosecutor stated, "At best, the State *will attempt to* use the statement if Kinney should take the stand and lie and testify differently than he testified in that statement. Well, Mr. Kinney doesn't have the right to get on the stand and lie. So it was—there is no detriment. He's not losing something that he's entitled to." (Emphasis added.)

definitive statement of what the district court *would actually do*. Thus, based on our reading of the November 12, 1998 Order, in conjunction with our review of the transcript of the hearing leading to that Order, we conclude that the Order did not make a final determination as to how, or even if, Kinney's statement could· be used at trial. Rather, the Order, in addition to concluding that Kinney was not entitled to specific performance of the plea agreement because there had been no meeting of the minds between the state and Kinney, explained why there was no basis for Kinney's detrimental reliance claim.

▮ To the extent that Kinney was confused by Conclusion 3 from the November 12, 1998 Order, any such confusion should have been eliminated on February 10, 1999, when use of the June 1, 1998 statement was revisited.ʼ On that date, the district court ruled that if Kinney took the stand and testified that he had given a statement to the police, the state would be allowed to put the entire statement into evidence.[5] At that same time, the district court, in no uncertain terms, made it clear that the June 1, 1998 statement was to be treated "as if the statement does not exist at all" and that it would be inappropriate for the statement to be used in any fashion. Based on the discussions that took place on February 10, 1999, Kinney should have understood that the district court was not going to allow the June 1, 1998 statement to be used for impeachment or any other purpose unless Kinney himself sought to use it to mislead the jury.

As discussed, Rule 410 prohibited the use of Kinney's June 1, 1998 statement by either party. Therefore, Kinney certainly did not have a right to use his June 1, 1998 statement to mislead the jury. Had he been permitted to do so, it would have resulted in unfairness to the state. Rule 106 of the Minnesota Rules of Evidence provides that "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Accordingly, under this rule of completeness, the district court did not err when it held that if Kinney brought up the June 1, 1998 statement, it would allow the state to put the entire statement into evidence.

Kinney's argument, that the statements he made when he waived his right to testify confirm that he was prevented from testifying, also fails. When he waived his right to testify, Kinney indicated that he would not testify because if he did, his June 1, 1998 statement would be brought up. The problem with this argument and the statements he made when waiving his right to testify, is that there is nothing in the record to support Kinney's bald assertion, at the time of the waiver, that if he testified his June 1, 1998 statement would be admitted. While the district court suggested in Conclusion 3 of the November 12, 1998 Order that the June 1, 1998 statement might be admitted for impeachment purposes, the district court never categorically ruled that it would be admitted for that purpose. Moreover, our review of the record satisfies us that the district court did not say anything or make any ruling on February 10, 1999, or at any other time, that would have led Kinney to believe that by merely taking the stand, the June 1, 1998 statement would be admitted. Nor has Kinney directed our attention to any such statements or rulings in the record. Thus, Kinney's comments at the time he waived his right to testify do not support his assertion that he was prevented from testifying. Because we conclude that the

---

5. The United States Supreme Court interpreted Federal Rule of Evidence 410, with provisions similar to Minn.R.Evid. 410, and concluded that the rule was meant to protect defendants and that, as such, defendants could agree to waive the exclusion and admit statements they made in the course of plea negotiations. *See United States v. Mezzanatto*, 513 U.S. 196, 200–01, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995).

district court did not prevent Kinney from testifying at his trial, we decline to reverse his conviction and grant him a new trial on that basis.

## II.

In his pro se brief, Kinney argues that he is entitled to specific enforcement of the plea agreement because he detrimentally relied on that agreement when he gave the June 1, 1998 statement to the police. This claim has no merit. "What the parties agreed to involves an issue of fact to be resolved by the district court." *See State v. Brown,* 606 N.W.2d 670, 674 (Minn.2000). A district court's findings of fact shall not be set aside unless clearly erroneous. *See Blanche v.1995 Pontiac Grand Prix,* 599 N.W.2d 161, 164 (Minn.1999). "Issues involving the interpretation and enforcement of plea agreements, however, are issues of law that we review de novo." *Brown,* 606 N.W.2d at 674. Kinney's June 1, 1998 statement was made in connection with the plea agreement that his lawyer negotiated with the state. The district court found that the agreement was contingent on Kinney not being one of the people who either stabbed or sexually assaulted Christenson. When Kinney indicated to the police that he in fact had stabbed and sexually assaulted Christenson, the state withdrew its offer of the plea agreement. The district court concluded, based on Kinney's June 1, 1998 statement, that there was a mutual mistake of fact regarding Kinney's involvement in Christenson's death and that Kinney did not detrimentally rely on the plea agreement. Our review of the record leads us to conclude that the district court's factual findings with respect to the plea agreement are not clearly erroneous, and that the district court did not err in its application of the law to those facts. Consequently, Kinney is not entitled to specific performance.

## III.

Kinney also argues in his pro se brief that both his grand jury indictment and trial were tainted by the state's improper use of his June 1, 1998 statement. Specifically, he claims that the state discovered and presented to the grand jury and at trial witnesses and evidence obtained as a direct result of the information he provided in that statement. This claim also fails. In its November 12, 1998 Order, the district court found that the state had not used the information obtained from or as a result of Kinney's June 1, 1998 statement (1) to make its charging decisions; (2) in the probable cause section of the complaint; (3) at the grand jury hearing; or (4) to obtain derivative evidence. In the November 12, 1998 Order, the court also found that the state had proven that it came upon the witnesses Kinney challenged independent of his statement. When we review a pretrial order seeking to have evidence suppressed, we "independently review the facts and determine, as a matter of law, whether the district court erred in * * * not suppressing [ ] the evidence." *State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999). Our independent review of the facts leads us to conclude that the district court did not err when it refused to suppress the challenged evidence.

The district court's November 12, 1998 Order notwithstanding, on January 29, 1999, the state agreed not to call a number of the challenged witnesses at trial and that any evidence involving those withdrawn witnesses that was presented to the grand jury should be withdrawn from the grand jury proceedings. The district court subsequently found in a February 18, 1999 Order, that there was sufficient evidence to indict Kinney without the evidence from the withdrawn witnesses.

"[A] presumption of regularity attaches to [an] indictment, and it is a rare case where an indictment will be invalidated." *State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988). Because of this presumption of regularity, a criminal defendant bears a heavy burden when seeking

to overturn an indictment. *See id.* "This is especially true where * * * the challenge is brought after appellant has been found guilty beyond a reasonable doubt following a fair trial." *Id.* In its February 18, 1999 Order upholding the indictment, the district court relied on the following facts: (1) the search warrants involved in the case were issued before the June 1, 1998 statement; (2) Octavia Jones, Michael Cleveland, and Daniel Thompson were not made aware of the contents of Kinney's June 1, 1998 statement; (3) the knife and the tape were found as a result of Thompson's interview and not Kinney's statement; (4) the attorney who presented the case to the grand jury had no knowledge of the substance of Kinney's statement nor did he use any information derived from the statement; (5) before Kinney gave his statement, the state had evidence to indicate that there were two possible stabbers and that Christenson had been sexually assaulted; and (6) Kinney was arrested on May 28, 1998 for probable cause murder based on information from Octavia Jones. A thorough reading of the record here establishes that the district court's factual findings are not clearly erroneous and that based on those findings, there was probable cause to support Kinney's indictment.

## IV.

■ Kinney next argues that the district court erred both when it denied his request for a jury instruction on the lesser but not included offense of third-degree assault and when it failed to specifically name his accomplices in the jury instructions. In *State v. Gisege*, we held that "the trial court had no discretion to grant the defendant's request for a jury instruction regarding a lesser but nonincluded offense * * *." 561 N.W.2d 152, 157 (Minn.1997). Therefore, the district court's refusal to include a jury instruction for third-degree assault was not error.

■ With respect to naming accomplices in jury instructions, we have said that "[u]nless the facts are undisputed or compel but a single inference, whether a witness is an accomplice is a question for jury resolution." *State v. Hanley*, 363 N.W.2d 735, 741 (Minn.1985) (citing *Tucker v. State*, 309 Minn. 482, 485, 245 N.W.2d 199, 201 (1976)). Following that standard, our review of the record leads us to conclude that the identity of the accomplices in this case was a question for jury resolution. Thus, the district court did not err by not specifically identifying Kinney's accomplices in its accomplice jury instruction.

## V.

Finally, Kinney contends that the prosecutor deprived him of a fair trial by committing misconduct during closing argument. We have carefully reviewed the record and can only conclude that the prosecutor did not engage in any misconduct during closing argument.

Affirmed.