STATE of Minnesota, Respondent,

v.

Jeffrey C. PENDLETON, Appellant.

No. A07–2313.

Supreme Court of Minnesota.

Jan. 29, 2009.

Lori Swanson, Attorney General, Peter R. Marker, Assistant Attorney General, St. Paul, MN; and Michelle A. Dietrich, Redwood County Attorney, Redwood Falls, MN, for respondent.

Cynthia J. Vermeulen, Vermeulen Law Office, St. Cloud, MN, for appellant.

## OPINION

MAGNUSON, Chief Justice.

Appellant Jeffrey C. Pendleton was convicted of premeditated first-degree murder and first-degree murder in the course of a kidnapping in connection with the stabbing death of Robert Berry, Jr. near Morton, Minnesota on September 24, 2004. Appellant argues that (1) the district court erred in not giving a specific accomplice instruction, (2) the State knowingly presented false evidence when it called a witness whose credibility the prosecutor had questioned at a different trial, (3) there was insufficient evidence to support appellant's convictions, and (4) the prosecutor engaged in prejudicial misconduct. We affirm.

On the evening of September 23, 2004, appellant attended a party at S.W.'s house in Morton. A number of other people were present, including Vernon Jones, Keith Crow, Morris Pendleton, Jr., W.S., A.C., G.D., and L.B.[1] People at the party were drinking alcohol and smoking marijuana. The victim, Robert Berry, Jr., arrived later. Berry was in a relationship with appellant's aunt, and appellant had briefly lived with Berry and his aunt. Appellant's aunt testified that Berry and appellant did not get along because Berry did not approve of the way appellant was "running around." Immediately after arriving at the party, Berry began yelling at appellant. Berry ultimately threw a soda bottle at appellant, who then jumped over a table and began fighting Berry.

Berry began to get the upper hand in the fight, and appellant called for help. Crow restrained Berry while Morris Pendleton restrained appellant. At some point during the fight, Berry elbowed Crow, knocking off his glasses. Crow then punched Berry and knocked him unconscious. Appellant was released by Morris Pendleton and began to hit and kick the unconscious Berry. While hitting and kicking Berry, appellant screamed "I hate you" multiple times. During the fight, most of the people at the party left.

After the fight ended, everyone remaining at the party, except for Berry, left in Berry's green Chevy Tahoe truck and drove around with no clear destination. Morris Pendleton drove, with Crow in the front seat with him, appellant, Jones, W.S. and A.C. in the middle seat, and S.W. and L.B. in the back. During the trip, some of the people in the car discussed what to do with Berry. Appellant suggested that

---

1. Witnesses and minors are referred to by their initials. Adult co-conspirators are referred to by name.

Berry be placed in the back of the truck and driven home. Morris Pendleton expressed concern that Berry might call the police, and suggested that appellant kill Berry. A.C. testified that appellant agreed to kill Berry and was acting "cocky" and "arrogant."

The group returned to S.W.'s house to pick up Berry, who was still unconscious. Crow asked S.W. for a blanket and a knife. Berry was wrapped in the blanket and appellant, Crow, Morris Pendleton, Jones, and W.S. carried Berry out to the truck and put Berry in the back of the truck. L.B. testified that A.C. opened the house door for the group. Morris Pendleton told Crow to tell A.C. to get in the truck so that A.C. would not call the police. S.W. and L.B. stayed behind and were told by Morris Pendleton to clean up Berry's blood or Morris Pendleton would hurt S.W.'s child.

Appellant, Crow, Jones, W.S., and A.C. left in the truck, with Morris Pendleton driving. There was no conversation during the drive about what was going to happen. Morris Pendleton drove the truck down a road to the edge of the Minnesota River. Everyone got out of the truck, and appellant, Crow, Jones, W.S., and Morris Pendleton took Berry out of the back of the truck and carried Berry down to the river. A.C. remained by the truck and talked to a friend on her cell phone. She could not hear or see what was happening at the river.

The state's medical expert testified that Berry was probably still unconscious when he was carried to the river. At the riverbank, Berry was stabbed fifteen times, resulting in his death. The only witness to testify about what happened by the river was Morris Pendleton. Morris Pendleton testified that appellant stabbed Berry more than once, and that while Crow egged appellant on, nobody forced appellant to stab Berry.

The group returned from the river after about ten minutes. Morris Pendleton was the first to return from the river, laughing while recounting that appellant had fallen in the river. Crow came up next, followed by W.S. and Jones. Appellant came up last, and, according to A.C., was soaking wet. When the group began to get back into the truck, Morris Pendleton said, "[W.S.] got him good" to which W.S. responded, "Hell, yeah, dog."

The group got in the truck and left the area. Morris Pendleton decided that the group should set the truck on fire. Everyone, including appellant, agreed. The group split up, with only Morris Pendleton, appellant, Crow, and A.C. remaining in the truck. At that point, Morris Pendleton drove to a house to get a can of gasoline. When he got back in the car, he handed the can to appellant. Then, Morris Pendleton drove back near the same area by the river where Berry had been taken. A.C. and Crow got out of the truck, and Morris Pendleton drove 15 or 20 more feet and set the truck on fire. A.C. testified she did not notice if anyone was in the truck when it was set on fire.

While the group drove to the river in the truck, a police officer on patrol in a squad car noticed the truck and decided to follow it. A.C., not knowing it was the police, and thinking it was a ride for the group that had been previously arranged, flagged down the squad car. After the squad car stopped, a police officer and A.C. noticed appellant fleeing wearing a white t-shirt. During the investigation, a white shirt was recovered from the area in which appellant was seen running. The shirt had blood on it from Berry, as well as DNA that could not be ruled out as being from appellant.

The police questioned Crow, who told the police that the group picked up three

"white guys from Marshall" at the casino before the car got stuck in the mud and started on fire. A.C. agreed with Crow's fabricated story. An officer drove A.C. and Crow back to the reservation and released them. Once A.C. and Crow were back on the reservation, appellant walked up to them, not wearing a shirt. Appellant, A.C., and Crow got a ride from the reservation to Glencoe, and then from Glencoe to the Twin Cities.

After spending a few hours in the Twin Cities area, appellant, A.C., Crow, and another friend headed north to Bemidji. Appellant and A.C. sat in the back seat during the ride. A.C. asked appellant "if they really killed that dude" and appellant responded that he had stabbed Berry "a grip of times." A.C. interpreted "a grip of times" to mean "a lot of times." A.C. also testified that appellant was in possession of two necklaces, which he said had been Berry's. Other witnesses testified that Berry always wore necklaces. Appellant kept one of the necklaces but threw the other out the window. Appellant also had money, which A.C. testified was unusual for appellant, but A.C. could not be sure whether appellant had the money before the events of September 23–24.

After spending a few days in Bemidji, appellant, A.C., and Crow went to Red Lake. There, the group parted; A.C. and Crow headed to Seattle and appellant eventually returned to the Twin Cities.

On October 7, 2004, while appellant was still on the run, he called his father in prison. In that conversation, which was recorded by prison officials, appellant admitted that he was involved "a lot" in Berry's killing. Appellant did, however, deny that he actually stabbed Berry. He said that he "didn't wanna go" with the others to the crime scene and that he "didn't want to stab" Berry. Appellant also denied ever having stabbed Berry,

telling his father that Morris Pendleton "put it [the knife] in my hand, told me to do it [stab Berry]. I told em ... I ain't doin it. And then I wiped ... it and I gave it back to em."

Appellant also told his father that he was passed out in the back of the truck at the time Morris Pendleton set the truck on fire, and that Morris Pendleton intended to kill him. Appellant said he jumped out of the truck with his leg on fire and put it out. The driver of the car to Bemidji, however, testified that, during the ride and time in Bemidji, appellant seemed healthy, did not limp, and did not say anything about being hurt. A.C. also did not see any injuries or burns.

Appellant was eventually indicted on three counts of first-degree murder: premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), intentional murder committed in the course of a kidnapping, Minn.Stat. § 609.185(a)(3) (2008), and intentional murder committed in the course of an aggravated robbery. Appellant was found guilty of premeditated murder and intentional murder committed in the course of a kidnapping, but acquitted of intentional murder committed in the course of an aggravated robbery. The district court convicted appellant of intentional murder committed in the course of a kidnapping and sentenced him to life imprisonment without possibility of parole.

Appellant challenges his conviction claiming: (1) the district court erroneously refused to give a specific accomplice instruction, (2) the district court erred by allowing a witness to testify falsely, (3) there was insufficient evidence to convict appellant on both first-degree murder charges, and (4) the State engaged in prosecutorial misconduct.

I.

Minnesota Statutes § 634.04 (2008) states that "[a] conviction cannot be had

upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense. . . ." The district court gave a general accomplice jury instruction but did not identify A.C. as an accomplice as a matter of law. Appellant claims this was reversible error.

■ A district court has "a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *State v. Strommen,* 648 N.W.2d 681, 689 (Minn.2002). The district court's decision to give jury instructions is reviewed under an abuse of discretion standard. *State v. Palubicki,* 700 N.W.2d 476, 487 (Minn.2005). Any error is reviewed using a harmless error analysis. *State v. Jackson,* 746 N.W.2d 894, 898 (Minn.2008).

■ Accomplice instructions are given because "an accomplice's credibility is inherently suspect." *Id.* The test for determining if a witness is an accomplice is whether the witness could have been "indicted and convicted for the crime with which the defendant is charged." *State v. Lee,* 683 N.W.2d 309, 314 (Minn.2004). In addition to directly committing the criminal acts, under Minn.Stat. § 609.05, subd. 1 (2008), a person may be criminally liable for aiding and abetting the crime if the person gives "intentional aid" to the commission of the crime. Therefore, in order to be an accomplice, the witness must have played a knowing role in the crime—the witness' mere presence at the scene is not sufficient. *Palubicki,* 700 N.W.2d at 487. If the question of whether a witness is an accomplice is disputed or subject to differing interpretations, then the issue is one of fact for the jury. *State v. Gail,* 713

N.W.2d 851, 863 (Minn.2006). A district court judge is only required to name specific accomplices in the jury instructions if the facts are "undisputed or compel but a single inference." *State v. Robledo–Kinney,* 615 N.W.2d 25, 33 (Minn.2000).

Here, the district court gave a general accomplice instruction to the jury and allowed the jury to determine whether, on these facts, A.C. was an accomplice. The district court instructed the jury:

> You cannot find the defendant guilty of [a] crime on the testimony of a person who could be charged with that crime unless that testimony is corroborated by other evidence that tends to convict the defendant of the crime. Such a person who could be charged for the same crime is called an accomplice. If you find that any person who has testified in this case is a person who could be charged with the same crime as the defendant, you cannot find the defendant guilty of a crime on that testimony unless that testimony is corroborated.

We conclude that the district court's jury instruction was not erroneous. The determination of whether A.C. was an accomplice was not "undisputed," nor did it "compel but a single inference." *Robledo–Kinney,* 615 N.W.2d at 33. Rather, a variety of inferences can be drawn from the facts, some of which support the conclusion that A.C. was an accomplice and some of which negate such a conclusion.

For instance, appellant claims, correctly, that A.C. was initially charged with the same crime as appellant,[2] remained with the group the entire night, opened the house door while the group carried Berry to the car, initially lied to the police about the events of the night, and fled after the

2. Initially, both appellant and A.C. were charged with second degree murder in connection with the killing of Berry. A.C. later pleaded guilty to aiding first-degree murder after the fact, while appellant was indicted for first-degree murder.

killing. But, there was no testimony that A.C. contributed to the conversation about killing Berry. Additionally, A.C. stayed near the car when the others stabbed Berry. Furthermore, A.C.'s actions in opening the door are as consistent with her acting out of fear as her acting to intentionally aid the crime. A.C.'s decision to lie to the police about what happened and to flee the jurisdiction is after-the-fact assistance, which is not relevant to an accomplice determination. *See State v. Henderson,* 620 N.W.2d 688, 701 (Minn. 2001); *Palubicki,* 700 N.W.2d at 488. Taken as a whole, although A.C. could potentially be seen as an accomplice, whether A.C. actually was an accomplice is a conclusion that is certainly subject to different interpretations.

The district court properly left the conclusion of whether A.C. was an accomplice to the jury and did not err in giving a general accomplice instruction.

## II.

Appellant's second argument is that the district court erred in allowing Morris Pendleton to testify. Appellant argues that the State knowingly proffered false testimony from Morris Pendleton in violation of Minn.Stat. § 609.48, subd. 1 (2008) (prohibiting making a false material statement) and Minn. R. Prof. Conduct 3.3(a)(3) (prohibiting knowingly offering false testimony). Appellant further argues that the district court erred in admitting the false testimony, and that his conviction should be reversed based on this error. We will uphold a district court's decision to admit evidence provided that the court did not abuse its discretion. *State v. Shannon,* 583 N.W.2d 579, 583 (Minn.1998).

At trial, the State called Morris Pendleton to the stand to testify that appellant stabbed Berry. The only factual testimony elicited during the State's direct examination of Morris Pendleton was that Morris Pendleton was present at the stabbing, he saw appellant stab Berry more than once, and that, other than being encouraged by Crow, appellant was not forced to stab Berry. The State also elicited background testimony that Morris Pendleton was tried and convicted of first-degree murder for killing Berry, and that Morris Pendleton had a criminal history. The defense then engaged in a lengthy cross-examination.

Appellant argues that the State suborned perjury by calling Morris Pendleton to the stand, because the State had challenged Morris Pendleton's testimony during Pendleton's trial. At his own trial, Pendleton testified he had observed the stabbing from atop the river embankment. The State had challenged Pendleton's testimony and even presented DNA evidence that created a strong inference that Pendleton was present at the river bank where the stabbing took place. The State did not discuss the DNA evidence at appellant's trial.

The evidence cited by appellant does not establish that the State or the district court erred and suborned perjury. Undoubtedly, the State challenged many portions of Morris Pendleton's testimony at his trial. The State, however, did not challenge the portion of Pendleton's testimony where he stated that he observed appellant stab Berry. At appellant's trial, the State did not ask Morris Pendleton where he was standing when he saw appellant stab Berry, whether Morris Pendleton stabbed Berry, or what happened at other points during the night—all issues that the State challenged at Morris Pendleton's trial. Rather, the State restricted its questioning to the extremely narrow issues on which it believed Morris Pendleton was credible—whether Morris Pendleton saw appellant stab Berry and whether appellant was

pressured to stab Berry. Accordingly, there is no basis for the claim that the State knowingly offered false testimony, and the district court did not abuse its discretion in allowing the testimony.

## III.

■■■■ Appellant's next claim is that the evidence was insufficient to convict him of first-degree premeditated murder, Minn.Stat. § 609.185, subd. (a)(1) (2008), and first-degree murder in the course of a kidnapping, Minn.Stat. § 609.185, subd. (a)(3) (2008). When reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict and assume that the fact finder rejected any evidence inconsistent with the verdict. *State v. Holliday*, 745 N.W.2d 556, 562 (Minn.2008) (citing *State v. Leake*, 699 N.W.2d 312, 319 (Minn.2005)). We will not disturb a verdict if the jury could reasonably conclude, given the presumption of innocence and the requirement of proof beyond a reasonable doubt, that the defendant was guilty of the charged offense. *State v. Crow*, 730 N.W.2d 272, 280 (Minn.2007). Assessing witness credibility and the weight given to witness testimony is exclusively the province of the jury. *Francis v. State*, 729 N.W.2d 584, 589 (Minn.2007). We may assume that the jury credited the state's witnesses and rejected any contrary evidence. *State v. Jackson*, 726 N.W.2d 454, 460 (Minn.2007).

■■■■ Minnesota Statutes § 609.185 (2008) defines first-degree murder as an intentional killing committed with premeditation or in the course of a kidnapping. Premeditation can be inferred if there is: (1) planning activity shown by the defendant's actions prior to the actual killing, (2) motive evidence inferred from the defendant's prior relationship with the victim, or (3) evidence as to the nature of the killing from which it can be inferred that the killing was premeditated. *State v. Kendell*, 723 N.W.2d 597, 605–06 (Minn.2006).

■■■■ Criminal liability may also result if the defendant aids and abets the commission of the crime. Minn.Stat. § 609.05, subd. 1 (2008). A person aids and abets if that person "aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." *Id.* In order convict a defendant for aiding and abetting, the State must show that the defendant actively played a role in the crime. *State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

■■■■ Here, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that appellant committed first-degree premeditated murder. In order to commit first-degree premeditated murder there must be (1) intent to kill, and (2) premeditation. Minn.Stat. § 609.185, subd. 1. There was sufficient evidence for the jury to conclude that appellant intended to kill Berry. Morris Pendleton testified that appellant stabbed Berry, and was not pressured to do so. Although appellant challenges the credibility of Morris Pendleton, witness credibility is an issue for the jury. *See Francis*, 729 N.W.2d at 589. Furthermore, the State presented evidence that appellant told his father, after the crime, that he was involved "a lot" in the killing, that appellant told A.C. that he stabbed Berry "a grip of times," and that appellant was in possession of necklaces and possibly money that belonged to the victim. These circumstances permit a jury to conclude that appellant killed Berry intentionally.

■■■■ There is also sufficient evidence that appellant acted with premeditation. Premeditation can be proven by planning

activity, motive, or nature of the killing. *Kendell*, 723 N.W.2d at 605–06. Here, there was testimony that, during the car ride, appellant agreed to kill Berry. Additionally, there was testimony that after the group made the decision to kill Berry, appellant helped carry Berry from the house to the truck and from the truck to the river. Furthermore, motive can be inferred by the defendant's prior relationship and conduct with the victim. *Id.* It is undisputed that appellant and Berry had fought on the night of the killing, and appellant's aunt testified that appellant and Berry had a rocky relationship prior to that night. Lastly, the nature of the killing is consistent with premeditation. Berry was transported from Williams' house to the river, stabbed fifteen times, and then thrown in the river. Because there was sufficient evidence of intent and premeditation, there is sufficient evidence that appellant was guilty of first-degree premeditated murder.

■■■ There is also sufficient evidence to find appellant guilty of first-degree murder in the course of a kidnapping. Minn.Stat. § 609.185, subd. 3. A kidnapping occurs if a person "confines or removes from one place to another, any person without that person's consent" to commit great bodily harm to that person. Minn.Stat. § 609.25 (2008). In order to constitute a kidnapping for the purposes of a felony murder, the kidnapping must be criminally significant and not incidental to the underlying murder. *State v. Earl*, 702 N.W.2d 711, 722 (Minn.2005). Here, there is evidence that appellant helped to move Berry from the house to the truck and from the truck to the river with the purpose of committing great bodily harm. Additionally, in *State v. Crow*, we found, on these same facts, that the kidnapping of Berry was criminally significant. 730 N.W.2d 272, 281 (Minn.2007). During the

course of that kidnapping, Berry was stabbed and killed. Therefore, there was sufficient evidence to convict appellant of first-degree murder in the course of a kidnapping.

■■■ Although we find that there was sufficient evidence to find appellant guilty of first-degree premeditated murder and first-degree intentional murder committed in the course of a kidnapping, even if there was insufficient evidence to prove appellant's direct involvement, he would also be guilty under a theory of aiding and abetting if he was intentionally present at the scene of the crime, knew his accomplices were going to commit a crime, and intended his presence to further that crime. *State v. Mahkuk*, 736 N.W.2d 675, 681 (Minn.2007). Here, appellant carried Berry's unconscious body from the house to the car and from the car to the river. Also, given the conversation during the first car ride about killing Berry, the jury could reasonably conclude that appellant knew the others planned to kill Berry. Therefore, there is sufficient evidence to show that appellant intended to aid and abet the others in the stabbing of Berry.

■■■ Appellant argues that the evidence was insufficient because appellant abandoned his criminal purpose and made a reasonable effort to prevent the commission of the crime. *See* Minn.Stat. § 609.05, subd. 3 (2008). Appellant points out that he made a non-violent suggestion about what to do with Berry, and then, according to his version of the events, refused to stab Berry. The evidence, however, is sufficient to show that appellant did not abandon his criminal purpose. There was evidence that after appellant made the suggestion not to kill Berry, he agreed to kill Berry, he carried Berry to the crime scene, and he stabbed Berry.

Appellant argues further that his effort to dissuade the killing was reasonable under the circumstances because he was under duress. Minnesota Statutes § 609.08 (2008) requires that there be a reasonable apprehension of instant death in order to find duress. Appellant claims that Morris Pendleton's threat to hurt S.W.'s child, Crow's possession of a knife, and Morris Pendleton's demand that A.C. accompany the group out of concern that she might call the police all created an "environment of fear and coercion." Additionally, appellant argues that after the killing Morris Pendleton lit the car on fire while appellant was still inside in an attempt to kill him. Witnesses, however, did not notice burn wounds on appellant. But, an environment of fear and coercion is not sufficient to create duress. As a result, the evidence is sufficient to demonstrate that appellant did not abandon his criminal purpose and was not under duress.

## IV.

Appellant also claims that the State committed prosecutorial misconduct that requires a reversal of his conviction. A prosecutor engages in prejudicial misconduct if the prosecutor's acts have the effect of materially undermining the fairness of a trial. *State v. Fields,* 730 N.W.2d 777, 782 (Minn.2007). A prosecutor also engages in prejudicial misconduct if the prosecutor violates rules, laws, orders by a district court, or this state's case law. *Id.* We consider the prosecutor's closing argument as a whole, and do not focus on selected phrases taken out of context. *State v. Taylor,* 650 N.W.2d 190, 208 (Minn.2002). We reverse a district court's decision to deny a new trial only if the misconduct, when considered in light of the whole trial, impairs the defendant's right to a fair trial. *Francis v. State,* 729 N.W.2d 584, 590 (Minn.2007).

Appellant contends that there were four instances of prosecutorial misconduct that were objected to at trial: (1) the State presented false evidence by calling Morris Pendleton to the stand and improperly vouched for his credibility; (2) the State improperly displayed a photo before it was admitted into evidence and at other points in the trial, (3) the State misstated the law when it said during closing arguments that if appellant "participated in the beating, then you're going to find the defendant responsible for Mr. Berry's death," and (4) the prosecutor disparaged the defense by telling the jury not to buy "what they [the defense] are selling" if the defense argued that the night was composed of separate incidents.

For prosecutorial misconduct that is objected to at trial, the standard of review varies based on the severity of the perceived misconduct. *State v. Caron,* 218 N.W.2d 197, 200, 300 Minn. 123, 127–28 (1974).[3] If the conduct is less serious, this court determines whether it "likely played a substantial part" in influencing the jury. *State v. Wren,* 738 N.W.2d 378, 390 n. 8 (Minn.2007). If the conduct is more serious, there must be "certainty beyond a reasonable doubt" that the error was harmless. *Id.* Misconduct is harmless beyond a reasonable doubt if the jury's verdict was "surely unattributable" to the misconduct. *State v. Dobbins,* 725 N.W.2d 492, 507 (Minn.2006).

Appellant's first argument is that when the State called Morris Pendleton to the stand, it improperly presented

---

**3.** Whether the *Caron* test is still good law has been questioned in some of our recent decisions. *See State v. McCray,* 753 N.W.2d 746, 754 n. 2 (Minn.2008). Because we find that the prosecutorial misconduct here is harmless even under the standard for more serious misconduct, we do not pass judgment on whether *Caron* is still good law.

false evidence and improperly vouched for Morris Pendleton's testimony. As we concluded above, the State did not present false evidence. Furthermore, the State did not improperly vouch for Morris Pendleton's testimony. Although prosecutors may not personally endorse witnesses, the State is free to argue that a particular witness is credible. *State v. Fields*, 730 N.W.2d 777, 785 (Minn.2007). Here, the prosecutor merely said that Morris Pendleton "didn't have anything to gain" because he did not receive a sentence reduction in exchange for his testimony and that his testimony was credible. The prosecutor's statements were general statements about credibility, not specific vouching, and were proper.

Next, appellant argues that the State improperly displayed a photograph with appellant and others at the party—which appellant calls the "gang photo"—before it was admitted into evidence and at other improper times throughout the trial. The record does not support appellant's argument. There was only one discussion between the State and the district court about the premature display of exhibits, and the "gang photo" was not at issue in that discussion. The only time the photograph was discussed on the record was when A.C. was questioned about the photograph immediately after it was admitted. Appellant's claim that the photograph was improperly displayed is not supported by the record, and, as a result, we cannot find any misconduct in the State's use of the photograph.

■ Third, appellant argues that the State misstated the law when the prosecutor argued in closing that if the jury believed that appellant "participated in the beating, then you're going to find the defendant responsible for Mr. Berry's death." Appellant argues that the prosecutor's statement falsely implied to the jury that participation in the beating was sufficient to find appellant guilty of murder. But cautionary instructions weigh against granting a mistrial, *State v. Robinson*, 604 N.W.2d 355, 361 (Minn.2000), and here, in response to the State's argument, the district court gave an additional instruction to the jury that "mere presence" was not sufficient to convict appellant of murder. Additionally, at many points in the closing argument, the State's attorney accurately described aiding and abetting liability and the correct expansive liability standard of "reasonable foreseeability," including during the very last parts of the closing argument. *See* Minn.Stat. § 609.05, subd. 2 (2008). Because closing arguments are evaluated as a whole, the State's one statement identified by appellant does not rise to the level of prosecutorial misconduct.

■ Appellant's last objected-to argument is that the prosecutor disparaged the defense by telling the jury not to buy "what they [the defense] are selling" if the defense argued that the night was composed of separate incidents. The State also told the jury not to "let anyone separate these things [events] out to you and portray them as all separate and isolated incidents." In addition, appellant takes issue with the prosecutor's statement that to acquit appellant the jury would need to reject all of the State's witnesses.

■ It is improper for a prosecutor to disparage the defense in the abstract or suggest that the defendant raised the defense because it offered the best chance of success. *State v. Wright*, 719 N.W.2d 910, 919 (Minn.2006). Here, the prosecutor's statements are based on the merits of its accomplice liability theory and witness credibility, not abstract statements about the defense generally. Therefore, the prosecution did not commit misconduct by disparaging the defense. Additionally,

even if the statement not to "buy what the defense was selling" was improper, the court issued a curative instruction reminding the jury to keep an open mind. As a result, we hold that none of appellant's claims of misconduct that was objected to at trial rise to the level to warrant reversal.

Appellant also raises various contentions of prosecutorial misconduct arising from statements made by the State which were not objected to at trial. For misconduct that the defendant did not object to at trial, the plain error doctrine applies. *Dobbins,* 725 N.W.2d at 508. Plain error is error that is clear or obvious, usually shown by an error that contravened case law, rules, or a standard of conduct. *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). If the defendant can show plain error, the burden shifts to the state to prove that the misconduct did not affect the defendant's substantial rights. *Id.* We have reviewed appellant's arguments in detail, and none of the statements that appellant argues are misconduct rose to the level of plain error nor did those statements affect appellant's substantial rights.

Affirmed.