STATE of Minnesota, Respondent,

v.

David James DOPPLER, Appellant.

No. C4–96–1831.

Supreme Court of Minnesota.

March 11, 1999.

Barry V. Voss, Voss & Hickman, P.A., Minneapolis, for appellant.

M. Hatch, Minnesota Attorney General, St. Paul, Donald F. Ryan, Crow Wing County Attorney, Brainerd, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

A jury convicted David James Doppler of the premeditated first-degree murder of Michael Sargent. Doppler now challenges a

postconviction court's denial of his motion for a new trial based on his claim of ineffective assistance of trial counsel. Doppler contends that the attorney who represented him at trial acted ineffectively when the attorney: (1) failed to object to an indictment issued by a grand jury impaneled more than 14 days after Doppler's first court appearance, (2) failed to present evidence at trial of Doppler's intoxication, and (3) failed to request that an intoxication instruction be given to the jury. The postconviction court concluded that Doppler failed to establish that trial counsel was ineffective in his representation of Doppler. Doppler also directly appeals his conviction for first-degree premeditated murder, contending that the state presented insufficient evidence to sustain the jury's guilty verdict. We affirm.

On April 14, 1995, the body of Michael L. Sargent was found in rural Crow Wing County near a public access road to Little Blackhoof Lake. Sargent's body had sustained four gunshot wounds—one to the right leg, one to the chin, and two to the head. The body bore no defensive wounds and the crime scene revealed no signs of a struggle. Sargent's jeans were unbuttoned and pulled down partway, as if he had been preparing to urinate.

After an extensive investigation of Sargent's killing, investigators began to focus on an acquaintance of Sargent—appellant David James Doppler. Authorities with the Bureau of Criminal Apprehension (BCA) asked Doppler to submit to a polygraph test at BCA headquarters in Saint Paul. When the results of Doppler's polygraph test indicated deception, he agreed to be interviewed by two BCA agents. During that interview, Doppler confessed to killing Sargent. The details of Doppler's confession are as follows.

A. Doppler's Confession

Doppler stated that he had known Sargent, a friend of his brother, Keith Doppler (hereinafter referred to as Keith), since Doppler was approximately 9 years old. Doppler was angry with Sargent for getting Keith involved with drugs and for threatening, in front of Doppler's nieces, to "put a bullet through [Keith's] head." This anger peaked

on April 9–10, 1995. According to Doppler, on April 9, 1995, he and Sargent decided to go out together in Doppler's car. As Doppler and Sargent drove around, Sargent convinced Doppler to try some methamphetamine. Doppler stated that, in addition to ingesting the methamphetamine, he had been smoking marijuana all day on April 9 and had been drinking gin and grapefruit juice for two days in order to get rid of a sinus infection.

Doppler stated that after he and Sargent had been driving for a while, the two men pulled off the road to go to the bathroom. Doppler stated that he was "just feeling like [he] could take on the whole world," purportedly from the methamphetamine he had taken. When the BCA agents asked Doppler what happened next, he answered, "[w]e had both gone outside, out of the car, to go to the bathroom * * *. I had went back into the car * * *. I had grabbed a gun that was underneath the seat * * *. I shot Mike." When questioned about when he formed the intent to kill Sargent, Doppler replied, "[w]hen we got out to go to the bathroom."

Authorities subsequently confirmed that two other people, specifically Richard Berry, who is Doppler's uncle, and Doppler's brother Keith, were present when Sargent was killed. Both Berry and Keith testified before the grand jury that investigated Sargent's death and at Doppler's trial. Their accounts of what happened the night Sargent was killed differed in several respects from Doppler's confession.

B. Berry's Testimony

Berry testified that, on the night of April 9, 1995, Keith and Sargent stopped by ACME Industries, Berry's and Doppler's place of work. ACME, a contract garment manufacturer, is located on the east side of Saint Paul. At the time, Berry and Doppler were playing a Nintendo video game. The four men then decided to go out together in Doppler's car. Berry testified that he was driving, Doppler was in the front seat, and Keith and Sargent were in the back seat. After they had been driving for a while, the four men stopped for "munchies" and "pop." When they got back in the car, Berry still

drove, but Keith sat in the front seat, and Doppler and Sargent sat in the back seat. Berry testified that, during the drive, he could not hear much of what was going on in the back seat because music was being played very loudly inside the car. Berry did remember that Sargent voiced his displeasure with Doppler's choice of music. Berry did not seem to think that either man was violent toward the other.

After driving for a while, the four men decided to stop so they could urinate. Berry pulled off the highway onto a public access road to Little Blackhoof Lake. Little Blackhoof Lake is west of the city of Crosby and is approximately 130 miles from Saint Paul. When the four men exited the car, Berry turned off the headlights, but left the engine running. The music was still being played loudly. Although not positive about the timing, Berry testified that a couple of minutes later, just as he was starting to urinate, he heard a gunshot and then "hit the ground." Next, he got up, turned around, and saw one flash going down toward the ground followed by a volley of three or more shots going forward. When the shots stopped, Berry ran back toward the car. Along the way, he heard Keith "crashing through the woods up near the front of the car."

When Berry reached the car, he saw Doppler standing in front of the car holding a gun in his hand. Berry testified that Doppler said Sargent "had come at him with a knife, and that he had to shoot him." Berry testified that at that point he panicked and "wanted out of there." The three men got into the car. Berry drove, Keith sat in the front seat, and Doppler sat in the back seat. Berry started to back down the access road toward the highway, but stopped when Keith asked him to stop the car so that Keith could check on Sargent. Berry stopped the car and Keith got out and returned to the car approximately 45 seconds later. Berry testified that he did not notice anything in Keith's hands when Keith returned and also testified that he did not see a knife at any time that night, either before or after the killing. Berry testified that the three men then drove back to the Twin Cities.

## C. Keith's Testimony

Keith testified that, on the night of April 9, 1995, he and Sargent had originally planned to go out together in Doppler's car. The two men left Sargent's hotel in Woodbury sometime after midnight with the intent to go to a bar in Saint Paul. When driving to the bar, Keith received a page from Doppler, so he and Sargent stopped at ACME, which is located next door to the bar they were headed for. When the two men arrived at ACME, they found Doppler and Berry playing a Nintendo video game. Doppler said he wanted his car back, but Keith, who had already put gas in the car, wanted to go out to do something. After discussing the use of the car, Keith and Sargent decided that it was too late for them to go out according to their original plans, so the four men decided to drive up north to a casino.

On the drive up north, Sargent used a knife to cut lines of methamphetamine for the men to snort. At some point, Doppler and Sargent began to argue over Doppler's choice of music. The argument became heated, but Keith testified that he did not think anything would come of the argument. Soon thereafter, Sargent directed Berry to turn the car off the highway onto a public access road to Little Blackhoof Lake so they could urinate. The stereo was still being played loudly when they exited the car. Keith went to the front passenger side and stepped approximately 20 feet into the woods in order to urinate. Keith, who testified to having a hearing problem and acknowledged that he had trouble hearing questions from the attorneys at trial, then testified that he heard Doppler and Sargent, who were approximately 33 feet away, start to scream at each other. He then heard a loud slap and a voice he thought was Sargent's say, "I'm going to kill you."

Keith testified that he started running toward the public access road where Doppler and Sargent were arguing. As Keith arrived at the road, he heard Doppler yell, "Get away." This yelling was followed by a gunshot which flashed into the air. Doppler yelled at Sargent to "get * * * away from him," and then there was another shot. Keith said he ran toward Sargent, who was

still standing. He then saw rapid shooting. When he arrived at the scene, Keith discovered Doppler on his knees a few feet from Sargent's body, crying and screaming. Keith testified that he threw Doppler into the back seat of the car, got in the front seat and, with Berry driving, he, Doppler, and Berry started to back down the public access road. As they were backing out, Keith told Berry they had better stop. When Berry stopped the car, Keith got out, went to Sargent's body, checked for a pulse and, finding none, reached in Sargent's back pocket and took Sargent's driver's license and identification. At that same time, Keith testified that he noticed a large buck knife laying on the ground next to Sargent's body. He picked up the knife, returned to the car, got in, and rode in the front passenger seat with the knife, blade open, in his right hand. He later disposed of the knife, which has never been recovered.

## D. Doppler's Trial Testimony

Doppler's testimony at trial both added to and differed from the confession he gave to the BCA agents. Doppler initially reiterated his anger toward Sargent. He went on to explain how and why he came into possession of the .357 magnum gun used to kill Sargent. Doppler testified that he purchased the gun from Craig Delo. He testified that he purchased the gun for protection from gang members with whom he had been involved. However, Doppler acknowledged that, immediately after he purchased the gun, he jokingly asked Delo how much it would be worth to Delo for Doppler to "do Mikey." It is undisputed that the "Mikey" referred to is Sargent. After Doppler purchased the gun, it was placed in his car.

On April 9, 1995, Doppler was working on a "spread" at ACME that he had to cut "before the night was over." Sometime during or after his work on the spread, he and Berry played a Nintendo video game at ACME. Wanting to get his car back, Doppler paged his brother, Keith. Keith and Sargent then came to ACME and, after some conversation about the car and their plans about what to do, the four men got into Doppler's car and headed up north to a casino. At some point along the way, Doppler stated that he tried a small amount of methamphetamine that Sargent offered to him. On cross-examination, Doppler stated that he "[did not] believe [he] was too much affected by the small amount [of methamphetamine he] took." During the drive, Doppler noticed footmarks on the dash of his car that he suspected were made by Sargent. Doppler and Sargent argued about the footmarks and about Doppler's anger over Sargent and Keith flicking ashes onto the floorboard of the car. Doppler and Sargent also argued about Doppler's clothing and choice of music. The argument escalated and Sargent threatened Doppler by saying, "If you don't * * * stop, you're going to get a bullet in your head like your brother."

Sometime during the argument, Berry pulled off the main highway and onto a public access road to Little Blackhoof Lake so the four men could urinate. Doppler followed Sargent out of the car and the argument escalated further. Sargent told Doppler, "I'm going to kick your ass." Doppler called Sargent a "punk," or some similar name; then Sargent told Doppler "I'm going to kill you." Doppler testified that he knew Sargent had a knife and that this knowledge caused him to return to his car to grab the gun from under the driver's seat. As he turned back around with the gun, Doppler said he saw the reflection from Sargent's knife and heard Sargent say again that he was going to kill Doppler. Doppler then fired one shot into the air and said something like, "Mike, calm this * * * down, quit it." Sargent then told Doppler, "You don't have the * * * balls to use that" and walked toward Doppler. Doppler testified that he fired one shot into the ground and all "the rest I shot higher." Doppler testified that he does not remember much about what happened after that, but does recall that Keith helped him into the car and that, during the drive back to the Twin Cities, Doppler told Berry and Keith that they should go to the police.

## E. Other Testimony

Albert Logan, a long-time friend of Doppler, testified about his knowledge of Dop-

pler's involvement in Sargent's death. Logan testified that, prior to Sargent's killing, he heard Doppler state that he would like to kill Sargent. But Logan said that he did not take the statement seriously. Logan also testified that, after Doppler had been arrested and was in jail, Doppler told Logan that he "had something to do with" Sargent's killing.

Craig Delo, the friend from whom Doppler purchased the gun he used to kill Sargent, was also called as a witness at Doppler's trial. Delo testified that, even though he thought Doppler was joking when he made the comment about how much it would be worth to Delo for Doppler to "do Mikey," Delo thought enough of the comment to attempt to contact Doppler after Sargent's killing. Delo testified that he contacted Doppler to inquire whether Doppler had killed Sargent and whether Doppler wanted Delo to pay for the killing.

## F.  Indictment and Convictions

Doppler was arrested on May 17, 1995, after he confessed to killing Sargent. On May 19, 1995, authorities in Crow Wing County issued a criminal complaint charging Doppler with murder in the second degree. An omnibus hearing was set for June 5, 1995. On May 22, 1995, Doppler's first attorney of record contacted the Crow Wing County Attorney to inform him that Doppler planned to move to have the May 17 confession suppressed. The two attorneys then agreed that the county attorney would not impanel a grand jury to investigate Sargent's death until after the omnibus hearing. The omnibus hearing was held as scheduled and Doppler, still represented by his first attorney of record, moved the court to suppress his confession. This motion was denied on July 7, 1995. Sometime between the June 5, 1995 omnibus hearing and July 24, 1995—the record does not disclose the exact date—a second attorney was retained by Doppler's family and substituted as counsel for Doppler. From July 17, 1995 until August 7, 1995, the county attorney and Doppler's counsel, initially his first attorney of record, then his second attorney of record, attempted to negotiate a plea agreement. On August 7,

1995, Doppler entered a plea of not guilty to murder in the second degree.

A grand jury was convened on September 19, 1995 to investigate Sargent's death. On September 20, 1995, the grand jury issued indictments against Doppler for first-degree premeditated murder and conspiracy to commit first-degree premeditated murder. The state dropped the conspiracy charge and Doppler's jury trial for first-degree premeditated murder began on May 28, 1996. The jury returned a verdict of guilty of first-degree premeditated murder against Doppler on June 7, 1996.

Doppler, through a third attorney, filed a motion with this court, asking us to remand Doppler's case to the Crow Wing County District Court for an evidentiary hearing on, *inter alia*, ineffective assistance of counsel. We granted his motion. An evidentiary hearing was subsequently held, but the postconviction court denied Doppler's motion for a new trial.

Doppler appeals to this court, again arguing that he should be granted a new trial because the attorney who represented him at trial, his second attorney of record, acted ineffectively when he: (1) failed to object to the indictment issued against Doppler by a grand jury that was impaneled more than 14 days after Doppler's first court appearance, (2) failed to present evidence at trial of Doppler's intoxication, and (3) failed to request an intoxication jury instruction. Doppler also directly appeals his conviction for first-degree premeditated murder, contending that the state presented insufficient evidence to sustain the jury's guilty verdict.

## I.

■ Doppler first appeals the postconviction court's denial of his motion for a new trial. He asserts that he was denied his right to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution. We review the postconviction court's proceedings only to determine whether there is sufficient evidence to sustain the postconviction court's findings. *See Scruggs v. State*, 484 N.W.2d 21, 25 (Minn.1992). "[A] post-conviction court's decision will not be disturbed absent an abuse

of discretion." *Id.* at 25. The burden rests on Doppler to show that the postconviction court's findings of fact and conclusions of law were the result of an abuse of discretion. *See State v. Powell,* 578 N.W.2d 727, 732 (Minn.1998).

The United States Supreme Court has stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, in *Strickland,* the Supreme Court adopted a two-pronged test for determining whether a defendant should be granted a new trial because of his counsel's performance. *Id.* at 687, 104 S.Ct. 2052. The two prongs of the *Strickland* test are the deficiency prong and the prejudice prong. *Id.*

■ Under the deficiency prong, a defendant must show by a preponderance of the evidence that his counsel's performance was deficient, i.e., that his counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052; *see also Gates v. State,* 398 N.W.2d 558 (Minn.1987) (quoting *Strickland).* In Minnesota, an attorney acts within the objective standard of reasonableness when he provides his client with "the representation of an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under the circumstances." *State v. Gassler,* 505 N.W.2d 62, 70 (Minn. 1993) (quoting *White v. State,* 309 Minn. 476, 481, 248 N.W.2d 281, 285 (1976)). A strong presumption exists that an attorney acted competently at trial. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.* at 693, 104 S.Ct. 2052. What evidence to present to the jury, including which witnesses to call, represents an attorney's decision regarding trial tactics and lies within the proper discretion of trial counsel. *State v. Jones,* 392 N.W.2d 224, 236 (Minn.1986). Appellate courts, which have the benefit of hindsight, do not

review for competency matters of trial strategy. *See id.*

■ Under the prejudice prong of the *Strickland* test, a defendant must show by a preponderance of the evidence that his counsel's error, whether or not professionally unreasonable, so prejudiced the defendant at trial that a different outcome would have resulted but for the error. *Strickland,* 466 U.S. at 687, 691, 104 S.Ct. 2052. In *Strickland,* the Supreme Court stated that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both [prongs] if the defendant makes an insufficient showing on one [prong]." *Id.* at 697, 104 S.Ct. 2052. The Supreme Court went on to encourage courts "to strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Id.*

A. Failure to Object to Grand Jury Indictment

■ Doppler argues that his second attorney of record acted ineffectively by failing to object to an indictment that was issued by a grand jury impaneled more than 14 days after Doppler's first court appearance. Rule 8.01 of the Minnesota Rules of Criminal Procedure provides that, in certain situations, a grand jury must be impaneled within 14 days of a defendant's first court appearance. Doppler argues that Rule 8.01 is not waivable and that, because Rule 8.01 is not waivable, his case should have been dismissed. Rule 8.01 requires that:

If the offense charged in the complaint is a homicide and the prosecuting attorney notifies the court that the case will be presented to the grand jury, or if the offense is punishable by life imprisonment, the presentation of the case to the grand jury shall commence within 14 days from the date of defendant's appearance in the court under this rule, and an indictment or report of no indictment shall be returned within a reasonable time.

Minn. R. Crim P. 8.01.

In order to clarify the operation of Rule 8.01, we begin our examination of this claim

under the prejudice prong of the *Strickland* test. Under the prejudice prong, Doppler must show by a preponderance of the evidence that objecting to the indictment would have changed the outcome of his trial. To prevail, he must show that defense counsel cannot waive the 14–day requirement of Rule 8.01 and that, had his second attorney of record objected to the indictment, his case would have been dismissed.

■ The purpose of Rule 8.01 is to ensure the defendant's right to "a timely determination of whether there is sufficient evidence to require him to stand trial." *State v. Genung*, 481 N.W.2d 130, 132 (Minn.App. 1992), *pet. for rev. denied* (Minn., April 13, 1992) (referencing *State v. Florence*, 306 Minn. 442, 456–57, 239 N.W.2d 892, 902 (1976)). While Rule 8.01 itself does not specifically provide for waiver of the 14–day time requirement, the criminal rules as a whole "are intended to provide for the just, speedy determination of criminal proceedings * * *. They shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay." Minn. R.Crim. P. 1.02.

■ Within five days of Doppler's arrest and three days of his first court appearance, Doppler's attorney informed the county attorney that Doppler planned to challenge the admissibility of his May 17 confession. Doppler's attorney and the county attorney then agreed that the county attorney would not impanel the grand jury until after Doppler challenged the admissibility of his confession at the omnibus hearing and had the opportunity to fully consider the county attorney's proffered plea agreement. Both Doppler's attorney and the county attorney believed that delaying the impaneling of the grand jury was a good idea. If the court suppressed Doppler's May 17 confession before the grand jury was impaneled, then Doppler's case might never have gone to the grand jury. The county attorney did not want to incur the expense and delay of impaneling a grand jury, only to recess that jury for the purpose of deciding whether Doppler's confession would be admissible, when the issue of admissibility could be determined prior to impaneling the grand jury.

Further, if Doppler had accepted the county attorney's proffered plea agreement, he would have avoided having his case go to the grand jury. In his affidavit to the postconviction court, the county attorney stated that, had Doppler's attorney not agreed to waive the 14–day time requirement, he would have impaneled the grand jury within the required 14 days and then recessed that grand jury to await the outcome of the suppression hearing.

Doppler argues that he was harmed by the delay in impaneling the grand jury. However, Doppler admits that he knew that his attorney was challenging the admissibility of his confession. Moreover, we are hard-pressed to believe Doppler's claim that neither of his attorneys informed him of the county attorney's proffered plea agreement. We find it incongruous for Doppler to seek to benefit from a delay in impaneling the grand jury, through a pre-grand jury suppression hearing and the opportunity to fully consider a plea agreement, and then to argue that he was harmed by that delay.

■ We conclude that holding a pre-grand jury suppression hearing and allowing a defendant to consider a plea agreement are in keeping with the purposes of Rule 8.01 and the criminal rules as a whole. Therefore, we hold that a defendant may waive the Rule 8.01 requirement that presentation of a case to the grand jury must commence within 14 days of the defendant's first court appearance. Doppler, through his first attorney, waived the 14–day requirement of Rule 8.01.

Because we conclude that the 14–day requirement of Rule 8.01 is waivable and that Doppler waived the requirement, we also conclude that Doppler's case would not have been dismissed had his second attorney of record objected to the grand jury indictment against Doppler. Accordingly, we hold that Doppler was not prejudiced by his attorney's failure to object to the grand jury indictment and that, therefore, his claim of ineffective assistance of counsel must fail. Because Doppler's claim fails under the prejudice prong of the *Strickland* test, we need not

examine the attorney's performance under the deficiency prong.

### B. Failure to Raise Intoxication and Request an Intoxication Jury Instruction

▉ Doppler next argues that his second attorney of record acted ineffectively by: (1) failing to present evidence that Doppler was too intoxicated to be capable of premeditating his killing of Sargent and (2) failing to request an intoxication instruction be given to the jury. We begin analysis of this claim under the deficiency prong of the *Strickland* test. Under this test, Doppler must show by a preponderance of the evidence that his attorney's failure to present evidence that Doppler was too intoxicated to premeditate his killing of Sargent and request an intoxication jury instruction constituted deficient performance.

Doppler's attorney testified at the postconviction court's evidentiary hearing. From this testimony, the postconviction court noted that the attorney stated that it was "a tactical decision not to focus on intoxication as a defense because [the attorney], after discussion with [Doppler], believed it was better to focus on [Doppler's] main defense of self-defense." The postconviction court also found that the attorney "did present evidence and final argument" on the issue of intoxication to the jury.

We agree with the postconviction court that the attorney's decision not to "focus on intoxication as a defense" provides no basis for relief. *See Jones*, 392 N.W.2d at 236. The attorney's failure to request an intoxication jury instruction was a matter of trial strategy. *See id.* As previously stated, we do not review for competence matters of trial strategy. *See id.; see also Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. Accordingly, we hold that the attorney's failure to present evidence that Doppler was too intoxicated to premeditate his killing of Sargent and to request an intoxication jury instruction did not constitute deficient performance. Therefore, Doppler's claim of ineffective assistance of counsel fails.

### II.

▉ Doppler is also before us on direct appeal, arguing that the evidence the state presented was insufficient to support the jury's verdict finding him guilty of first-degree premeditated murder. When considering whether the evidence in a case is sufficient to support a guilty verdict, we examine the evidence presented in the record, along with legitimate inferences from that evidence, to determine whether the jury could have concluded that the state met its burden of proving beyond a reasonable doubt that the defendant was guilty of the offense charged. *State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992). We review the evidence set forth in the record in the light most favorable to the jury's verdict and assume that the jury believed the state's witnesses and disbelieved evidence contradicting those witnesses. *Dale v. State*, 535 N.W.2d 619, 623 (Minn.1995); *State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978). Deciding the credibility of witnesses is generally the exclusive province of the jury. *Dale*, 535 N.W.2d at 623; *Merrill*, 274 N.W.2d at 111.

Doppler was convicted of first-degree premeditated murder, which is defined by statute as "caus[ing] the death of a human being with premeditation and with intent to effect the death of the person or of another." Minn.Stat. § 609.185(1) (1998). Doppler confessed that he killed Sargent and that he intended to do so and he did not dispute that part of his confession at trial. Berry and Keith, the only other persons at the scene on the night Sargent was killed, also do not dispute that Doppler killed Sargent. Therefore, this court must decide whether a jury could have concluded that Doppler's killing of Sargent was premeditated.

In Doppler's May 17 confession, he detailed how he *returned* to the car after he and Sargent got out to go to the bathroom, grabbed the gun that was underneath the driver's seat of the car, and shot Sargent. Further, when BCA agents asked Doppler when he formed the intent to kill Sargent, he responded, "[w]hen we got out to go to the bathroom." The prosecution also presented evidence at trial that Doppler had a motive to kill Sargent and that, to that end, Doppler

took the step of purchasing the gun with which he killed Sargent. Doppler was angry with Sargent for getting his brother, Keith, involved with drugs and threatening, in front of Doppler's nieces, to kill Keith. When Doppler purchased the gun used to kill Sargent, he asked the seller—Craig Delo—how much it would be worth to Delo for Doppler to "do Mikey." Moreover, the jury could certainly have disbelieved Doppler's claims of self-defense, which he raised for the first time at trial and which contradicted his confession and the crime scene investigators' statements that Sargent's body and the crime scene bore no signs of a struggle. We conclude that the state presented evidence sufficient to support the jury's verdict finding Doppler guilty of premeditated first-degree murder.

Affirmed.