**Michael Jon STAUNTON,
petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. A09–782.**

Supreme Court of Minnesota.

June 30, 2010.

David W. Merchant, Chief Appellate Public Defender, Michael F. Cromett, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Minnesota Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Melanie Ford, St. Louis County Attorney, Duluth, MN, for respondent.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Michael Jon Staunton was found guilty by a St. Louis County jury of first-degree premeditated murder, in violation of Minn.Stat. § 609.185(1) (1998), and three counts of first-degree felony murder while committing or attempting to commit burglary, kidnapping, and tampering with a witness, in violation of Minn.Stat. §§ 609.185(3) (1998) and 609.05 (2008), for the stabbing death of Darryl Kokochak on November 23, 1999. Staunton was sentenced to life without the possibility of release on the first-degree felony murder (kidnapping) conviction. On appeal, Staunton argues that (1) the evidence was insufficient as a matter of law to establish his guilt, and (2) he received ineffective assistance of counsel. Staunton's pro se brief does not raise additional issues. We affirm.

On the evening of November 23, 1999, Debra Kokochak discovered the body of Darryl Kokochak (Kokochak), her estranged husband, in the basement of his house in rural Mountain Iron, Minnesota.

Police began the investigation by interviewing Kokochak's neighbors, Brian and Laura McClure. Following a third interview, Brian McClure (McClure) admitted to knowing about events surrounding the death of Kokochak, and identified Staunton and ultimately, Staunton's friend, Roy Olson, as the perpetrators. Staunton was a drug dealer and McClure and Kokochak regularly purchased drugs from him.

The police investigation revealed that about a year earlier, in September 1998, a

search warrant including a reference to Kokochak was executed at Staunton's house. The search resulted in the seizure of controlled substances and over $80,000 in cash, and Staunton was charged with controlled-substance crimes. Police continued to investigate Staunton. Kokochak provided incriminating information regarding Staunton's drug dealing in August 1999. As part of the discovery process in Staunton's criminal proceedings, Staunton's attorney received a copy of Kokochak's statement; the attorney sent a copy of the statement to Staunton in early November 1999.[1] Staunton showed the transcript to McClure, and told McClure that he was upset and wanted to talk to Kokochak. Staunton repeatedly asked McClure if Kokochak was home.[2] The night before Kokochak's murder, Staunton again asked McClure if Kokochak was home.

On the day of Kokochak's murder, Staunton called McClure's home at about 1 p.m. to ask McClure to join him for lunch at the Sawmill Bar in Virginia, Minnesota. McClure's daughter, A.M., answered the phone and told Staunton that her father was not home—despite the fact that he was home—because she did not want to babysit her two younger siblings. At about 4:15 p.m., McClure's wife, Laura, and A.M. saw Staunton's car parked at the Sawmill. They went inside and spoke with Staunton.[3] During their conversation, A.M. mentioned to Staunton that Kokochak was home.

Laura and A.M. left the Sawmill, ran several errands, and returned home more than an hour later. When they returned home, McClure was gone and had left the youngest two children home alone. Because the McClures did not have long-distance service, A.M. called a friend, and asked her to call Staunton and ask if McClure was with him. A.M.'s friend called Staunton at about 5:22 p.m., and Staunton said that McClure was with him.

McClure testified that after A.M. told Staunton that Kokochak was home, Staunton went to McClure's home and insisted that McClure go to the Sawmill with him. At the Sawmill, Staunton told McClure that Olson would be joining them and that they were going to talk to Kokochak. When McClure declined to go with Staunton, Staunton demanded that McClure participate and threatened McClure's family. Olson testified that he joined Staunton and McClure at the Sawmill.[4]

Staunton, McClure, and Olson rode to Kokochak's house in Olson's truck. There was a .22 semi-automatic Ruger pistol on the floor of Olson's truck. While en route, at about 5:50 p.m., Olson's girlfriend called Olson's cell phone. According to McClure, Staunton insisted that everyone turn off their cell phones immediately thereafter. Between 5:53 p.m. and 6:24 p.m., Staunton received four calls that went to his voice mail, suggesting that his phone was turned off.

1. After Kokochak's death, police searched Staunton's home and discovered a transcript of Kokochak's interview incriminating Staunton as a drug dealer.

2. Kokochak was a nuclear technician who frequently traveled for work.

3. Staunton admitted that he spoke with Laura and A.M. at the Sawmill that afternoon. Further, the Sawmill's bartender confirmed that

Staunton was at the Sawmill at about 4:30 p.m., and that Staunton was sitting where both Laura and A.M. claimed that he was, and eating the meal generally described by both Laura and A.M.

4. A waitress at the Sawmill who knew Olson confirmed that he was there the evening of Kokochak's murder, but she did not remember what time he was there.

Both McClure and Olson testified that Olson parked the truck on the road near Kokochak's driveway. McClure, acting on Staunton's instructions, knocked on Kokochak's door. Kokochak answered, and Staunton fired the .22 pistol, yelling "you snitch, you snitch." [5] McClure testified that he attempted to leave, but Olson threatened his family, so McClure stood outside Kokochak's house.

Olson testified that he also tried to run away but that Staunton fired the .22 pistol at him and threatened to kill him if he did not return and hold Kokochak down. McClure testified that he saw Olson choking Kokochak and Olson dragging Kokochak back into the house. Olson testified that inside the house Staunton "whipped" Kokochak down the basement stairs and continued to yell at him. Staunton and Kokochak were briefly out of Olson's sight. Olson then saw Kokochak fall, and saw Staunton holding a knife.

Olson and Staunton came out of the house, and Olson, Staunton, and McClure all ran toward Olson's truck. Just before reaching the truck, at about 6:22 p.m., a car approached, and Staunton demanded that they hide in the ditch.[6] After hiding, they got in the truck, and McClure noticed that Staunton had a knife. Staunton and Olson let McClure out of the truck near his house; when McClure got home, Laura sensed that something bad had happened to Kokochak. Laura was concerned, and she left a message on Kokochak's answering machine at about 6:33 p.m., asking Kokochak to bring soda over for mixed drinks. Laura and A.M. went to Kokochak's house later that evening, but did not find Kokochak.[7]

Olson testified that after they let McClure out of the truck, they drove a little farther down the road and then Staunton told Olson to stop. Staunton ran into a ditch, crouched down, and then ran back to the truck. Olson dropped Staunton off at the Sawmill.

When police first questioned Staunton, he claimed he was not sure who Darryl Kokochak was. In a second interview, Staunton was extremely nervous and agitated while police questioned him about Kokochak's murder; he trembled and shook uncontrollably. During his interviews, Staunton said that the day of Kokochak's murder, he drove from Cotton to Virginia between 3:00 p.m. and 4:00 p.m. He claimed he ate at the Sawmill in Virginia, and left between 5:00 p.m. and 6:00 p.m. Next, Staunton claimed that he went to the El Toro Supper Club in Cotton, and arrived between 5:30 p.m. and 6:30 p.m. But Staunton's cell phone records indicate that he did not leave Virginia until after 6:40 p.m., and did not arrive in Cotton until about 7:08 p.m. Two witnesses who knew Staunton did not see him arrive at the El Toro until about 7:00 p.m. This is bolstered by the surveillance videotape from the El Toro; Staunton first appears in the tape at 7:19 p.m. Next, Staunton claimed that he went to the Dawghouse Bar near Canyon at about 7:00 p.m. But a witness who knew Staunton saw him pull into the parking lot of the Dawghouse at about 8:15 p.m. Staunton first appeared in the surveillance videotape from the Dawghouse at 8:24 p.m.

During the investigation, police discovered a spent .22 casing at Kokochak's house

---

**5.** Olson told police that the .22 pistol "went off," but agreed that Staunton called Kokochak a "snitch."

**6.** A neighbor testified that she drove by Olson's truck at about 6:22 that evening.

**7.** Laura and A.M. initially denied entering Kokochak's house.

and a bullet hole in the porch wall. Police also found .22 bullets in Olson's truck, which matched the casing found at Kokochak's house. There was also blood splattered on Kokochak's outside door that DNA testing identified as Kokochak's blood. Further, at about 5:30 p.m., witnesses heard a gunshot coming from the direction of Kokochak's house. The autopsy revealed that there were bruises on Kokochak's neck and the inside of his arm, indicating that he had been restrained during a struggle. Kokochak died as a result of a 6-to-7-inch long stab wound to his heart. Hunters found a knife in the area where Staunton got out of Olson's truck and crouched in the ditch. There was no physical evidence linking the knife to the murder, but the size and shape of the knife were consistent with Kokochak's wound.

Both Staunton and Olson were indicted for first-degree murder. Olson's trial was conducted first; he was acquitted of first-degree murder but convicted of first-degree manslaughter. McClure was not charged with a crime related to Kokochak's death.

Both Olson and McClure testified at Staunton's trial. The jury was instructed that Olson was Staunton's accomplice, and that his testimony must be corroborated to support a guilty verdict. The jury was also instructed that "[i]f you find that Brian McClure is a person who could be charged with the same crime as the Defendant, you cannot find the Defendant guilty of a crime on [McClure's] testimony unless the testimony is corroborated." *See also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 3.18 (5th ed. 2006).

The jury found Staunton guilty of all four counts. On January 31, 2001, the district court sentenced Staunton to life without the possibility of release on the first-degree felony murder (kidnapping) conviction.

Staunton timely filed a notice of appeal, which was stayed for consideration of his first petition for postconviction relief. *See* Minn. R.Crim. P. 29.03, subd. 3. Staunton's first petition for postconviction relief was dismissed without prejudice and Staunton's direct appeal was subsequently dismissed. Staunton filed a second petition for postconviction relief, which was also dismissed without prejudice.

Staunton timely filed his third petition for postconviction relief on April 9, 2007. *See* Act of June 2, 2005, ch. 136, § 13, 2005 Minn. Laws 1097, 1097–98 (codified at Minn.Stat. § 590.01, subd. 4 (2008)) (imposing a time limit for filing petitions for postconviction relief and allowing "[a]ny person whose conviction became final before August 1, 2005 ... two years after [August 1, 2005] to file a petition for postconviction relief"). After an evidentiary hearing, the postconviction court denied Staunton's third petition for postconviction relief on March 5, 2009. Because of the anfractuous post-trial procedure of Staunton's case, this is the first appellate review of his claims, and the State concedes that Staunton is entitled to full appellate review of his claims.

## I.

Staunton argues that the evidence presented at trial was not sufficient to support the conviction of first-degree murder.[8] Specifically, Staunton argues

---

8. Staunton's third petition for postconviction relief raised four claims: ineffective assistance of counsel, insufficiency of evidence, judicial bias, and prosecutorial misconduct. Both Staunton's and the State's briefs address

two of those claims: insufficiency of the evidence and ineffective assistance of counsel. Therefore, we address those claims on the merits. Neither party briefed the judicial-bias or prosecutorial-misconduct claims, and

that pursuant to Minn.Stat. § 634.04 (2008),

> [a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Corroboration may not be provided merely by the testimony of another accomplice. *State v. Harris,* 405 N.W.2d 224, 227 (Minn.1987). Staunton argues that (1) Olson and McClure were accomplices as a matter of law, (2) the State's case rested on their uncorroborated testimony, and (3) the evidence was therefore insufficient. The State counters that McClure was not an accomplice, and therefore his testimony did not need to be corroborated. Alternatively, the State argues that even if McClure was an accomplice, the other evidence presented sufficiently corroborated both Olson's and McClure's testimony, and therefore supported Staunton's conviction.

■ In assessing the sufficiency of the evidence, we conduct "a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Ferguson,* 742 N.W.2d 651, 658 (Minn. 2007) (citation omitted) (internal quotation marks omitted). We will not disturb a guilty verdict " 'if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [a] defendant was proven guilty of the offense charged.' " *Bernhardt v. State,* 684 N.W.2d 465, 476–

77 (Minn.2004) (quoting *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979)).

■ We explained in *State v. Clark,* 755 N.W.2d 241, 253–54 (Minn.2008), that "corroborative evidence [of the accomplice testimony] does not need to be sufficient to establish a prima facie case of the defendant's guilt or sustain a conviction." *Accord Harris,* 405 N.W.2d at 228. Rather, the corroborating evidence need only link the defendant to the crime "in some substantial degree [that] tends to affirm the truth of [the accomplice's] testimony and to point to the guilt of the defendant." *Clark,* 755 N.W.2d at 253 (citation omitted) (internal quotation marks omitted). Put differently, the other evidence " 'is sufficient when it is weighty enough to restore confidence in the truth of the accomplice's testimony.' " *Harris,* 405 N.W.2d at 227 (quoting *State v. Sorg,* 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966)).

■ A witness is an accomplice if the witness could have been "indicted and convicted for the crime with which the defendant is charged." *State v. Pendleton,* 759 N.W.2d 900, 907 (Minn.2009) (citation omitted) (internal quotation marks omitted). In addition to directly committing the criminal acts, a person may be considered an accomplice if he or she aided and abetted the crime with which the defendant is charged. *Id.* A person may be criminally liable for aiding and abetting the commission of a crime if the person "intentionally aids" the commission of the crime. Minn.Stat. § 609.05, subd. 1 (2008). "Therefore, in order to be an accomplice, the witness must have played a knowing role in the crime—the witness' mere presence at the scene is not sufficient." *Pendleton,* 759 N.W.2d at 907.

---

therefore those claims are waived. *See State v. Hurd,* 763 N.W.2d 17, 32 (Minn.2009) (concluding that a claim in the postconviction

petition that was not briefed by either party was waived); *Scruggs v. State,* 484 N.W.2d 21, 24 n. 1 (Minn.1992).

Olson was indicted for the first-degree murder of Kokochak. The district court properly instructed the jury that Olson was Staunton's accomplice as a matter of law. McClure, however, was not identified as an accomplice in the jury instructions; rather, the district court allowed the jury to determine his status as a question of fact.

■ Staunton argues that McClure was an accomplice as a matter of law. If the question of whether a witness is an accomplice is "subject to differing interpretations" and does not "compel but a single inference," then it is a question of fact for the jury. *Pendleton,* 759 N.W.2d at 907 (citation omitted) (internal quotation marks omitted); *accord State v. Jensen,* 289 Minn. 444, 447, 184 N.W.2d 813, 815 (1971) (concluding that evidence "susceptible of an inference of complicity," does not conclusively establish accomplice status as a matter of law). Recently, we held that the district court properly let the jury determine whether a particular witness was an accomplice as a question of fact. *Pendleton,* 759 N.W.2d at 908. In *Pendleton,* we concluded that A.C.'s status as an accomplice was properly a question of fact for the jury despite the facts that: (1) A.C. was originally charged with the same crime as the defendant; (2) A.C. was with a group, which included the defendant, the entire night; (3) A.C. opened a door while a group, including the defendant, carried the victim to the car; (4) A.C. was near the victim when the murder occurred, but removed from the exact location of the crime; (5) A.C. lied to police about the events of the night; and (6) A.C. fled after the crime. *Id.* at 907–08. We observed that opening the door was "as consistent with [A.C.'s] acting out of fear as her acting to intentionally aid the crime," and that lying to police about what happened and fleeing the scene may constitute after-

the-fact assistance, but were legally distinguishable from accomplice assistance. *Id.* at 908.

■ Like the alleged accomplice in *Pendleton,* McClure testified that he knocked on Kokochak's door out of fear because Staunton had threatened McClure's family. Also similar to the circumstances in *Pendleton,* McClure was outside Kokochak's house, which removed him from the exact location of the crime, and McClure lied to police about what happened. McClure and his family fled after Kokochak's murder, which is consistent with McClure's declaration that he lied because he was fearful for his family's safety. Significantly, McClure was never charged with a crime related to Kokochak's murder. Therefore, we conclude that because the facts do not compel a single inference, McClure's accomplice status was properly a question of fact for the jury.

Viewing the evidence in a light most favorable to the verdict, the jury could have concluded that McClure was not an accomplice and that his testimony did not need to be corroborated. McClure did not intentionally aid Olson and Staunton in killing Kokochak. Instead, the evidence established that McClure went to Kokochak's house as an unwilling participant who was threatened, that he tried to leave the scene when he realized Olson and Staunton were going to hurt Kokochak, and that he remained at the scene only when his family was threatened again. If the jury concluded that McClure was not an accomplice, McClure's uncorroborated testimony alone was sufficient to support Staunton's conviction. *See State v. Hill,* 285 Minn. 518, 518, 172 N.W.2d 406, 407 (1969) (noting that "[i]t is well-settled that a conviction can rest on the uncorroborated testimony of a single credible witness").

 But even if the jury concluded that McClure was an accomplice, the evidence was sufficient to corroborate both Olson's and McClure's testimony. Corroborating evidence need only substantially affirm the truth of Olson's and McClure's testimony and point to Staunton's guilt. *See Clark*, 755 N.W.2d at 253. Corroboration may be found from "the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed." *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980). Circumstantial evidence, such as cell phone evidence and forensic evidence, may be sufficient to corroborate accomplice testimony. *Ferguson*, 742 N.W.2d at 658–59.

Here, the State presented evidence that police found a transcript of Kokochak's interview incriminating Staunton on his pending drug case under Staunton's bed, which corroborated the testimony that Staunton showed McClure the transcript. It also corroborated the claim that Staunton yelled "you snitch" at Kokochak prior to the murder. Further corroborating McClure's testimony, Staunton admitted that on the day of Kokochak's murder, he spoke with A.M. A.M. testified that during that conversation she told Staunton that Kokochak was home. McClure's son, J.M., testified that Staunton came over to their house and then left with McClure. A.M.'s friend testified that she called Staunton and he confirmed that McClure was with him. A waitress at the Sawmill testified that she saw Olson at the Sawmill that evening. Therefore, sufficient corroborating evidence was presented to buttress the truth of Olson's and McClure's testimony that Staunton was with them the evening of Kokochak's murder.

Additionally, cell phone evidence indicated that Staunton's cell phone was off between 5:53 p.m. and 6:24 p.m., the presumed time of Kokochak's murder. A witness in the area heard a gunshot near the time Olson and McClure claimed that Staunton fired a .22 pistol at Kokochak. Forensic evidence indicated there was a bullet hole in Kokochak's porch wall, and the .22 bullets found in Olson's truck matched the casing found at Kokochak's house. The medical examiner's testimony that Kokochak's neck was bruised corroborated the testimony that Olson choked Kokochak.

A neighbor's testimony that she observed Olson's truck parked on the road near Kokochak's house at 6:22 p.m. the night of Kokochak's murder corroborated that a car drove by as Olson, McClure, and Staunton were leaving Kokochak's house. Finally, there is corroboration that after Olson and Staunton dropped McClure off, Staunton ran into a ditch, crouched down, apparently discarded the knife, and then ran back to the truck. Specifically, hunters found a knife in the area where Staunton stopped, and the knife was consistent with Kokochak's wound.

Staunton's counsel aggressively cross-examined the corroborating testimony of Laura, A.M., J.M., and A.M.'s friend. He repeatedly pointed out that Laura had lied to police. He asked A.M. how "we" knew whether she was telling the truth now based on her earlier lies to police. He challenged A.M.'s friend on her inconsistent statements to police. Although Staunton challenges the credibility of each witness for a variety of reasons, the weight of their collective testimony sufficiently corroborates the testimony of Olson and McClure. *See State v. Reed*, 737 N.W.2d 572, 585 (Minn.2007); *see also Pendleton*, 759 N.W.2d at 909 ("[a]ssessing witness credibility and the weight given to witness testimony is exclusively the province of the jury"); *Harris*, 405 N.W.2d at 229 ("[w]here evidence of corroboration appears its weight and credibility is for the

jury" to determine (citation omitted) (internal quotation marks omitted)). Additionally, the jury was given instructions regarding witness credibility both at the beginning and the end of Staunton's trial. Our careful review of the record convinces us that McClure's testimony was sufficiently corroborated.

## II.

Staunton also argues that his trial counsel was ineffective and deprived him of his right to a fair trial. According to Staunton, his trial counsel failed to conduct a thorough investigation of other potential defenses before selecting the alibi defense. Further, he claims that his trial counsel failed to properly investigate the crime scene and the alibi defense, and failed to interview alibi witnesses. The State counters that Staunton's allegations of ineffective assistance of trial counsel all fall within trial tactics or strategy, and therefore are not relevant to trial counsel's performance. Further, the alleged deficiency in trial counsel's performance did not affect the outcome of Staunton's trial.

Generally, the question of whether counsel was ineffective involves a fundamental constitutional right, and therefore is reviewed de novo. *See Sanchez–Diaz v. State*, 758 N.W.2d 843, 846 (Minn.2008). But factual findings made by the postconviction court following an evidentiary hearing are reviewed for an abuse of discretion. *See State v. Doppler*, 590 N.W.2d 627, 632–33 (Minn.1999). Staunton was required to establish the facts alleged in his third peti-

tion for postconviction relief by a preponderance of the evidence. *See* Minn.Stat. § 590.04, subd. 3 (2008).

To prevail on an ineffective-assistance-of-counsel claim, Staunton must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) a reasonable probability exists that, but for counsel's errors, the outcome would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Sanchez–Diaz*, 758 N.W.2d at 847–48; *State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003). The first prong of the *Strickland* test is the deficiency prong. *Doppler*, 590 N.W.2d at 633. It is presumed that counsel's performance was reasonable. *Scruggs*, 484 N.W.2d at 27. We review the reasonableness of counsel's performance based on the totality of the facts that existed at the time of counsel's conduct. *Rhodes*, 657 N.W.2d at 844. The second prong of the *Strickland* test is the prejudice prong. *Doppler*, 590 N.W.2d at 633. Again, Staunton must prove that without counsel's errors, the outcome of the trial would likely have been different. *See Sanchez–Diaz*, 758 N.W.2d at 848. We need not analyze both prongs of the *Strickland* test if either one is determinative. *Williams v. State*, 764 N.W.2d 21, 30 (Minn.2009).

Based upon the record, we conclude that Staunton failed to satisfy the prejudice prong of the *Strickland* test.[9] Staunton contends that a better investiga-

---

**9.** Trial counsel hired an investigator to uncover evidence bolstering Staunton's alibi defense. The investigator interviewed alibi witnesses, gathered November 23, 1999, receipts from the Sawmill, clocked driving times between the Sawmill and Kokochak's house and the Sawmill and the El Toro, and investigated the outside of Kokochak's house. Trial counsel, however, failed to thoroughly investigate

the crime scene, and did not review either the videotapes or approximately 340 photographs taken by police of the crime scene and the victim. At oral argument, the State conceded that trial counsel's lack of investigation was "startling." Although the lack of investigation is certainly disturbing, it is not necessary to address the deficiency prong in light of the absence of prejudice to Staunton.

tion would have revealed that the photograph of a knife rack with a missing knife submitted into evidence at trial was improperly identified. It is undisputed that a police officer erred in testifying that the photograph was taken at Kokochak's house, when it was actually taken at a hunting shack to which Olson had access. It was the State's theory, however, that because Olson was Staunton's accomplice, Staunton was not prejudiced. Additionally, the postconviction court concluded that further investigation of the photograph was unnecessary because if the jury accepted the alibi defense, the knife was inconsequential. We conclude that the erroneous testimony regarding the knife was not prejudicial.

██ Staunton contends that a reasonable investigation would have discredited Olson's and McClure's testimony that Staunton and Olson fought with Kokochak before the murder. Staunton claims that if trial counsel had reviewed all of the photographs taken during the investigation, he would have seen that Kokochak's clothes were not disheveled and that there was no gravel on his clothing. But this is contradicted by the autopsy testimony that there were bruises around Kokochak's neck and arm consistent with a struggle. The lack of gravel on Kokochak's clothing was insignificant because it was late November and there was snow on the ground. Staunton was not prejudiced.

██ Staunton also complains that a more thorough investigation would have uncovered evidence to discredit the timeline propounded by Olson and McClure. Staunton contends that counsel should have reviewed Kokochak's answering machine tape, which contained a message from Laura indicating that she and McClure were having mixed drinks and asking Kokochak to bring some soda and join them. Because that message was left at 6:33 p.m., Staunton argues that it disproves the timeline of Olson and McClure because McClure could not have been home at 6:33 p.m. But a neighbor drove by Staunton, McClure, and Olson as they were leaving Kokochak's house at about 6:22 p.m. Both Olson and McClure testified that McClure was immediately dropped off near his home, which was about a mile away from Kokochak's house and thus the evidence establishes that McClure could have been home at the time of the answering machine message. Put differently, the message does not discredit Olson's and McClure's timeline. Further, in any event, the jury heard witnesses testify about the content of the message at trial. Staunton's argument is unpersuasive.

██ Staunton claims that counsel failed to talk to Judy Voeltz, and that her testimony "would have provided *unequivocal* support for Staunton's alibi." (Emphasis added.) At the evidentiary hearing, Staunton introduced an affidavit from Voeltz from February 2003, stating that Staunton "came in [to the El Toro in Cotton] a little after 6:00 p.m." the night of Kokochak's murder. But even if counsel had investigated Voeltz's claim, her assertion is flatly contradicted by cell phone records, videotape surveillance, and another witness. Staunton's cell phone records indicate that he was not in Cotton until about 7:08 p.m. Staunton does not appear in videotape surveillance at the El Toro until 7:19 p.m. Finally, a witness who knew Staunton for several years testified that he first saw Staunton at the El Toro at about 7:00 p.m. We conclude that Staunton has not established prejudice from the failure of counsel to further investigate possible testimony from Voeltz.

██ Staunton also claims that counsel failed to investigate Debra or an unidenti-

fied burglar or intruder as alternative perpetrators. Specifically, Staunton argues that counsel should have elicited testimony that Debra and Kokochak argued one week before Kokochak's murder. At the evidentiary hearing, Staunton introduced an affidavit from a motel employee indicating that Debra and Kokochak had fought. But the jury heard testimony that Debra and Kokochak were separated and had a violent relationship, and therefore it is unlikely to the point of improbability that the additional evidence would have altered the jury's perceptions of Debra's motive or testimony. Further, a defense theory that Debra murdered Kokochak could not explain why Olson was convicted of first-degree manslaughter for the death of Kokochak or why Olson and McClure falsely implicated Staunton. Also, Staunton offers no explanation as to how counsel could have tracked down an unidentified burglar nor how Olson's conviction could be explained by a burglar as an alternative perpetrator theory.

Staunton claims that trial counsel did not investigate whether the jacket that Staunton was wearing the night of the murder carried physical evidence linking Staunton to the murder. This contention is incorrect. Staunton's trial counsel cross-examined police about the jacket in question, and established that there was no physical evidence on the jacket linking Staunton to Kokochak's murder.

According to Staunton, a more thorough investigation would have proven that Laura knew Kokochak was deceased before she went to Kokochak's house. But Staunton's trial counsel expressly asked Laura if she knew that something had happened to Kokochak before she went to Kokochak's house. Laura answered, "I had a pretty good idea that something had [happened]. I had a feeling." Thus, the jury already heard that information.

Staunton claims that a reasonable investigation "would have presented evidence that Olson enlisted jail inmates to falsely claim" that Staunton confessed to Kokochak's murder. But Staunton's trial counsel was provided with this evidence. His decision not to present the evidence at trial falls squarely within our conclusion in *Francis v. State* that "[w]hat evidence to present and which witnesses to call at trial are tactical decisions properly left to the discretion of trial counsel." 729 N.W.2d 584, 592 (Minn.2007) (citation omitted) (internal quotation marks omitted). Further, this evidence does little more than challenge Olson's credibility. Olson was an accomplice and the jury was instructed that as a matter of law his testimony must be corroborated.

Staunton also claims that trial counsel should have objected to the introduction of the knife into evidence. Counsel testified at the evidentiary hearing that he did not object to the knife because it actually exonerated Staunton by "show[ing] nothing that tied him to the crime." Further, there is no indication that if Staunton's trial counsel had objected, the district court would have excluded the knife. *See State v. Rainer,* 502 N.W.2d 784, 789 (Minn.1993) ("An attorney's failure to make a meaningless objection does not give rise to a claim of ineffective assistance of counsel."). We conclude that Staunton has failed to establish any of his ineffective-assistance-of-counsel claims.

Staunton raises three additional incidents of ineffective assistance of counsel in his pro se brief. First, he claims that his trial counsel should have retained a cell phone expert witness. The State's cell phone witness testified about Staunton's location based on cell tower use, and that Staunton's phone was off during the time of the murder. Staunton

does not indicate why or how a different cell phone expert witness would have either (1) arrived at different conclusions or (2) affected the outcome of the trial. Second, he claims that his trial counsel did not argue at trial that the search warrant against Staunton executed in 1998 was not a public record, implying that Staunton could not have known that Kokochak was named in the search warrant. But counsel testified at the evidentiary hearing that he did not object to the warrant because it was immaterial to Staunton's alibi defense. Further, it is undisputed that police seized a transcript of Kokochak's interview incriminating Staunton as a drug dealer from under Staunton's bed. Thus, regardless of whether the search warrant was a public record, Staunton was aware that Kokochak was cooperating with police. Third, Staunton claims that his trial counsel did not challenge the search warrant's references to drug dealing. But, independent of the unredacted drug dealing references in the search warrant, there is ample evidence in the record that Staunton was a drug dealer. Staunton's pro se claims of ineffective assistance of counsel are without merit.

Affirmed.